UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONNIE WADDELL,

    Plaintiff,

v.

DENNIS LLOYD, *et al.*,

    Defendants.

Case No. 16-14078
Honorable Laurie J. Michelson
Magistrate Judge David R. Grand

**OPINION AND ORDER GRANTING CORIZON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [53]**

Ronnie Waddell spent ten days in the Genesee County Jail. When the deputies booked him, he told his jailers he was not currently using drugs or alcohol. But two days into his stay, Waddell started to exhibit symptoms of withdrawal: agitation, aches, and hallucinations. The sheriff's deputies noticed and informed jail medical personnel. Hours later, a nurse saw Waddell and learned that, prior to his arrest, Waddell had been a daily methadone, Xanax, and alcohol user. So from that point forward, the jail's medical staff monitored and treated Waddell until his release a few days later. Several times during Waddell's withdrawal, non-medical personnel had to physically restrain him.

Waddell sued. Against his jailers, he brought claims of excessive force. Against the medical staff, he alleged deliberate indifference to his serious medical need. Only the jail medical staff move for summary judgment. And for the reasons that follow, they are entitled to it.

**I.**

On August 6, 2015, Ronnie Waddell was booked into the Genesee County Jail. (ECF No. 56, PageID.626–632.) That evening, deputies completed what the jail calls a Medical Assessment

form. (ECF No. 55, PageID.565.) The form required Waddell to respond yes or no to questions about garden variety medical concerns. (*Id.*) Relevant to Waddell's stay in the jail, the form asked whether he was currently suffering from drug or alcohol withdrawal. (*Id.*) Another set of questions sought information about whether Waddell was currently under the influence of drugs or alcohol. (*Id.*) Waddell answered no to all. (*Id.*)

Less than 48 hours later, Waddell started to show symptoms of withdrawal. Jail staff first noticed around 2:30am on August 8, as evidenced by a hand-written note on Waddell's Medical Assessment Form. (ECF No. 55, PageID.565.) Soon after, a nurse initiated a more thorough intake screening. (*Id.* at PageID.572–575.) And Waddell offered more information. (*Id.* at PageID.573.)

Waddell said that prior to his arrest he had been taking Xanax along with 120 milligrams of methadone every day. (ECF No. 55, PageID.573.) And he said he had been consuming a 12-pack of beer every day for the past three to four months. (*Id.*) He also mentioned prior episodes of withdrawal, recounting painful symptoms like nausea, vomiting, aches, and restlessness. (*Id.*)

After completing the more thorough intake, the nurse relayed the information to Dr. Dennis Lloyd. Lloyd ordered jail medical staff to start monitoring Waddell. (ECF No. 55, PageID.584.) To monitor Waddell, Lloyd wanted the nurses to employ two protocols: one adopted by the Clinical Institute for the Withdrawal of Alcohol (CIWA) and another called the Clinical Opiate Withdrawal Scale (COWS). (*Id.*) Each protocol monitored Waddell's vitals (*id.* at PageID.600) and catalogued whether Waddell was suffering from any physical or psychological symptoms of withdrawal (*see, e.g.*, *id.* at PageID.601). And over the phone, Lloyd prescribed Valium to help ease Waddell's withdrawal. (*Id.* at PageID.584.)

Nursing staff immediately implemented Lloyd's orders. From August 8 through August 12, nurses administered the Valium. (ECF No. 55, PageID.590, 594.) And over the same time,

2

three times a day, nurses administered both the CIWA and COWS protocols. (ECF No. 55, PageID.600–610.)

Early on, the protocols indicated Waddell exhibited symptoms of mild to moderate withdrawal. (*Id.* at PageID.601, 602, 604.) But over time Waddell's symptoms subsided. (*Id.* at PageID.607–610.) By late evening on August 12, the protocols were discontinued. (*Id.* at PageID.610, 587.)

Two days later Waddell's symptoms returned. (ECF No. 55, PageID.587.) And around the same time, he became assaultive and uncooperative with the deputies, so he was tased, pepper sprayed, and eventually moved from his cell to a restraint chair. (ECF No. 56, PageID.635–636.) As the deputies were restraining him, Waddell repeatedly yelled, "kill me." (ECF No. 56, PageID.637.) So he was placed in a safety cell, restrained, and evaluated by jail medical staff. (ECF No. 56, PageID.637, 650.)

Nurse Andrea Rodgers recorded Waddell's symptoms. She noted he was anxious, clammy, and pale. (ECF No. 55, PageID.587.) And his anxiety kept him up at night. (*Id.*) Rodgers contacted Lloyd to report Waddell's new symptoms. (*Id.*) Over the phone, Lloyd prescribed another round of Valium. (*Id.*) Waddell received the medication. (*Id.*)

Early on August 15, another nurse, Elizabeth Jones, checked on Waddell. Jones noted Waddell was still anxious and combative. (ECF No. 55, PageID.587.) So Jones called Lloyd, and Lloyd ordered jail medical staff to resume the COWS and CIWA protocols. (ECF No. 55, PageID.598–599.) And once more, over the phone Lloyd prescribed a dose of Valium and other medications to address Waddell's withdrawal. (ECF No. 55, PageID.588, 594.)

But later on August 15, when Nurse Jessica Leader-Jones went to administer the protocols and give Waddell the medications, Waddell refused everything. (ECF No. 55, PageID.596–597.)

3

And she noticed he was talking to people not present. (ECF No. 53, PageID.484) So Leader-Jones called Lloyd. (*Id.*) Again, Lloyd phoned in an order for more medications. (ECF No. 55, PageID.592.)

Leader-Jones tried to give Waddell those medications. But Waddell refused to take them. (ECF No. 55, PageID.589, 596–597.) So Leader-Jones made another call to Lloyd. Lloyd recommended a medical injection, which Leader-Jones administered. (*Id.* at PageID.587.) And Leader-Jones noted that Waddell responded well to it. (ECF No. 55, PageID.587.)

That night, Waddell allowed Leader-Jones to administer the COWS and CIWA protocols. (*Id.*) The protocols indicated Waddell was suffering from severe withdrawal. (*Id.* at PageID.599.) So the nurses continued his medications and monitored Waddell. (*Id.* at PageID.597.)

Early the next morning, August 16, Waddell became uncooperative with the deputies. (ECF No. 56, PageID.643.) So once more he was pepper sprayed and restrained. (*Id.* at PageID.643–648.) Once Waddell was restrained, Nurse John Bexton confirmed the straps were not too tight. (ECF No. 56, PageID.645.) Bexton also dressed a minor wound on Waddell's hand. (*Id.*) And while Waddell was restrained, he refused to let the jail medical staff administer the COWS or CIWA protocols. (ECF No. 55, PageID.597.) However, two hours later, Waddell was released from custody and deputies transported him to Hurley Medical Center in Flint, Michigan. (*Id.*)

Hurley Medical Center treated Waddell for withdrawal. (ECF No. 57, PageID.694–695.) They also noted Waddell may have been exhibiting symptoms of a psychological disorder. (*Id.*) In any event, Waddell's withdrawal symptoms required admission to the ICU. (*Id.* at PageID.698.) But by August 20, Waddell's symptoms were under control and he reported feeling much better. (*Id.* at PageID.711.) Indeed, the next day Waddell checked himself out of Hurley's ICU, against medical advice. (*Id.*)

In time, Waddell brought § 1983 claims against the sheriff's deputies at the Genesee County Jail, Dr. Lloyd, and all the jail nurses who monitored and treated him. Waddell says the deputies used excessive force, and the medical personnel exhibited deliberate indifference to his serious medical needs.

Only the jail medical personnel move for summary judgment.

**II.**

Summary judgment is appropriate where there are no genuine disputes of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

**III.**

Waddell says Dr. Lloyd and nurses Rogers, Jones, Leader-Jones, and Bexton each provided medical care so inadequate it violated the Constitution. But Waddell's case presents a wrinkle. Neither side provides enough information to determine whether Waddell was incarcerated at the Genesee County Jail following a conviction, or merely detained there awaiting trial. And the distinction matters.

In *Estelle v. Gamble*, 429 U.S. 97, 97 (1976), the Supreme Court established an incarcerated prisoner's Eighth Amendment right to medical care. *Estelle* held that deliberate indifference to an inmate's serious medical condition violates the Eighth Amendment's "cruel and unusual punishments" clause. *Id.* at 104–05; *see also* U.S. Const. amend. VIII. And the Fourteenth Amendment prohibits deliberate indifference to a pretrial detainee's medical needs. *Bays v. Montmorency Cty.*, 874 F.3d 264, 268 (6th Cir. 2017).

A deliberate indifference claim has both an objective and subjective component. *See Rhinehart v. Scutt*, 894 F.3d 721, 737 (2018). The objective component requires a showing of a serious medical condition. *See Bays*, 874 F.3d at 268. And the subjective component requires a

showing of each individual defendants' "sufficiently culpable state of mind." *Rhinehart*, 894 F.3d at 737.

When an inmate brings a deliberate-indifference claim, the sufficiently culpable state of mind needed to establish the subjective component comes from the text of the Eighth Amendment. *See Rhinehart*, 894 F.3d at 737. The Eighth Amendment prohibits certain "punishments." U.S. Const. amend. VIII. And "punishments" include the provision of inadequate medical care. *Rhinehart*, 894 F.3d at 737; *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994). But inadequate medical care amounts to a punishment "only if the government actor, at a minimum, knew the care provided or withheld presented a serious risk to the inmate and consciously disregarded that risk." *Id.*. So the sufficiently culpable state of mind needed to establish deliberate indifference must be criminal recklessness, "'tantamount to intent to punish.'" *Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012) (quoting *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994)); *see also Carl v. Muskegon Cty.*, No. 12-2302, 2017 U.S. App. LEXIS 18914, at *6–7 (6th Cir. June 30, 2017).

However, pretrial detainees are entitled to a presumption of innocence. *See Miranda v. Cty. of Lake*, 900 F.3d 335, 350 (7th Cir. 2018). So punishment of any kind is not permitted. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015); *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Accordingly, *Kingsley* lowered the showing a pretrial detainee needed to make in order to establish a sufficiently culpable state of mind. Rather than subjective recklessness, a detainee need only make the lesser showing that the defendant's conduct was objectively unreasonable. *Kingsley*, 135 S.Ct. at 2472–73.

But *Kingsley* involved an excessive-force claim. *See Kingsley*, 135 S.Ct. at 2473. And the circuits are split on whether *Kingsley* extends to claims of deliberate indifference. *See Miranda*,

6

900 F.3d at 352 (applies); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018) (applies); *Bruno v. City of Schenectady*, 727 F. App'x 717, 720–21 (2d Cir. 2018) (applies); *but see Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) (does not apply); *Nam Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (does not apply); *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017) (does not apply). Importantly, the Sixth Circuit has touched upon the issue, suggesting *Kingsley* warrants a reconsideration of circuit precedent. *See Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018) ("[W]e recognize that [*Kingsley*'s] shift in Fourteenth Amendment deliberate indifference jurisprudence calls into serious doubt whether Richmond need even show that the individual defendant-officials were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them."). Notwithstanding *Richmond*, later Sixth Circuit cases, albeit unpublished ones, do not extend *Kingsley* to deliberate-indifference claims brought by pretrial detainees. *See McCain v. St. Clair Cty.*, 750 F. App'x 399, 403 (6th Cir. 2018).

So the Court will proceed based on the (still) governing legal standard in the Sixth Circuit. To show deliberate indifference on the part of the Genesee County Jail's medical professionals, Waddell needs to establish each defendant "'subjectively perceived facts from which to infer substantial risk to [Waddell], that he [or she] did in fact draw the inference, and that he [or she] then disregarded that risk' by failing to take reasonable measures to abate it." *Rhinehart*, 894 F.3d at 738 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). At bottom, the medical professionals must have "consciously expos[ed] [Waddell] to an excessive risk of serious harm." *Richmond*, 885 F.3d at 940. However, "prison officials who actually knew of a substantial risk . . . may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844

7

As for the Defendants in this case, each one says, on the present record, no reasonable jury could return a verdict in Waddell's favor. Each defendant says they monitored and treated Waddell's withdrawal. And they never consciously disregarded a substantial risk of serious harm to Waddell. So each defendant says nothing in the record establishes their sufficiently culpable state of mind.

Because Waddell cannot establish the subjective component, the Court skips the objective inquiry. *See McCain*, 750 F. App'x at 403. And the Court will individually analyze each medical professional's state of mind.

### A.

Waddell says Dr. Lloyd was subjectively reckless when he "never bothered to assess" Waddell "during his jail stay despite having knowledge of several violent interactions with the guards." (ECF No. 62, PageID.745.) Waddell points to Lloyd's practice of phoning in orders without seeing the patient. The nurses relayed some information to Lloyd, so Lloyd knew Waddell had serious symptoms. But, says Waddell, Lloyd disregarded those symptoms because he never bothered to assess his individualized needs. (*Id.*)

It is true that over ten days Lloyd never treated Waddell in person. And in that time, Waddell exhibited symptoms of severe withdrawal. Indeed, Waddell was admitted to an ICU after leaving Lloyd's care. And Lloyd's habit of phoning in medical treatment has caused issues in the past. *See Shehee v. Saginaw County*, 86 F. Supp. 3d 704, 715 (E.D. Mich. 2015) ("Dr. Lloyd's practice of phoning in medical care raises significant concerns.")

Even so, Lloyd's conduct does not rise to the level of criminal recklessness. The record suggests that Lloyd responded to all calls he received from the nurses and prescribed some course of action. When Lloyd learned of Waddell's withdrawal, he ordered monitoring and Valium that,

8

initially anyway, appears to have eased Waddell's symptoms. And when Waddell's symptoms returned, Lloyd ordered more monitoring and medication. And when he learned that Waddell would not orally take the medications, he ordered an injection. Even though Lloyd's second batch of orders does not appear to have been as effective, "[w]hen 'a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted.'" *Rhinehart*¸ 894 F.3d at 743 (quoting *Self v. Crum*, 439 F.3d 1227, 1232–33 (10th Cir. 2006)); *see also French v. Daviess County*, 376 F. App'x 519, 522 (6th Cir. 2010) (finding no sufficiently culpable mental state where doctor ordered course of Valium to treat Xanax withdrawal). Thus, even if Waddell's subsequent admission to an ICU suggests Lloyd's phoned-in treatment might have been negligent, negligence is not enough to sustain a deliberate indifference claim. *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001). So no reasonable jury could conclude Lloyd consciously exposed Waddell to an excessive risk of serious harm.

**B.**

Next Waddell says Jessica Leader-Jones watched him suffer through withdrawal and did next to nothing. And the record shows Leader-Jones documented Waddell's "significant decline" in "function both as to level of anxiety and hallucinatory behavior." (ECF No. 62, PageID.743.) So, Waddell concludes, Leader-Jones was deliberately indifferent.

No reasonable jury could think so. Leader-Jones first had contact with Waddell on August 10 when she administered the CIWA and COWS protocols, implementing Lloyd's orders. (ECF No. 53, PageID.482.) Leader-Jones recorded mild symptoms of withdrawal. (*Id.*) The next time she saw Waddell was five days later, on August 15. That day, she noticed Waddell was agitated. (*Id.*) So she called Lloyd. (*Id.*) Lloyd prescribed medication; Leader-Jones gave it to Waddell. (*Id.*

9

at PageID.483.) And later, when Waddell started to hallucinate and refuse his medications, Leader-Jones again consulted Lloyd and, per his orders, administered Waddell's medications via injection. (*Id.* at PageID.483–485.) The injection was the last treatment Leader-Jones gave Waddell. And she noted Waddell was taking to it well. (ECF No.55, PageID.587; ECF No. 53, PageID.484.)

Leader-Jones did not consciously disregard a substantial risk to Waddell. Consistent with Lloyd's orders, Leader-Jones monitored and treated Waddell's withdrawal. *See Bauer v. Kramer*, 424 F. App'x 917, 919 (11th Cir. 2011) (holding that "a nurse is not deliberately indifferent when she reasonably follows a doctor's orders by administering prescribed medication to an inmate") And nothing in the record suggests she did so while blindly disregarding any potential risk posed by Lloyd's planned course of treatment. *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) ("As a matter of professional conduct, nurses may generally defer to instructions given by physicians, but that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient. A nurse may therefore act with deliberate indifference if [she] ignore[s] obvious risks to an inmate's health in following a physician's orders." (internal quotations and citations omitted)). So no reasonable jury could find Leader-Jones deliberately indifferent.

## C.

Next Waddell says Andrea Rodgers was deliberately indifferent to the physical force deputies employed to restrain Waddell. (ECF No. 62, PageID.743.) And she failed to notice just how bad Waddell's withdrawal was on August 14. (*Id.*)

Rodgers was not deliberately indifferent to Waddell's medical need. On August 14, Rodgers documented the return of Waddell's symptoms and contacted Lloyd. Lloyd prescribed treatment, and Waddell received that treatment. And Rodgers had nothing to do with the force

10

used against Waddell. So no reasonable jury could say Rodgers consciously disregarded Waddell's symptoms on August 14.

### D.

Next is John Bexton. Waddell does not spell out why Bexton was deliberately indifferent. But from the record, it appears Waddell thinks Bexton was deliberately indifferent to the physical pain Waddell suffered as a result of deputies restraining him on August 16. (ECF No. 62, PageID.743; ECF No. 56, PageID.645.) Waddell suffered a cut to his hand and was placed in a restraint chair. Waddel says Bexton knew about the force but did nothing. (*Id.*)

No reasonable jury could agree. The record shows Bexton responded when deputies called him. He confirmed the restraints were not too tight. (ECF No. 56, PageID.645.) And Bexton dressed a wound on Waddell's hand. (*Id.*) Indeed, when Waddell was admitted to Hurley, he complained of the physical force, but medical professionals at Hurley noted he had some bruising but no serious injuries. (ECF No. 57, PageID.694–695.) So on this record, no reasonable jury could find Bexton deliberately indifferent.[1]

### E.

That leaves Elizabeth Jones. Once more, Waddell never points to instances where Elizabeth Jones provided substandard medical care. At most, Waddell might be complaining about Jones' monitoring early on August 15. Then, Jones noted Waddell's withdrawal symptoms appeared to be returning, so she phoned Lloyd and Lloyd reinstated the COWS and CIWA monitoring. And

---

[1] The Court notes that, while somewhat merged in Waddell's response brief, the medical personnel's alleged deliberate indifference is a separate issue from jailers' alleged excessive force. If the Corizon Defendants were not deliberately indifferent to Waddell's serious medical need, they would not be responsible for any harm caused to Waddell from the jailers' efforts to restrain him.

11

for that reason, no reasonable jury could believe Jones provided medical care that violated the Fourteenth Amendment.

## IV.

In sum, the Court GRANTS the Corizon Defendants' motion for summary judgment. (ECF No. 53.) No reasonable jury could find for Waddell on any of his deliberate indifference claims. What remains then, are Waddell's claims of excessive force against the deputies. Those claims will proceed to trial.

s/Laurie J. Michelson  
LAURIE J. MICHELSON  
UNITED STATES DISTRICT JUDGE

Date: March 26, 2019

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, March 26, 2019, using the Electronic Court Filing system.

s/William Barkholz  
Case Manager